# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RRK HOLDING COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  04 C 3944 |
| v. | ) | |
| | ) | |
| SEARS, ROEBUCK AND CO., | ) | Judge David H. Coar |
| | ) | Magistrate Judge Nan R. Nolan |
| Defendant. | ) | |
| | ) | |

## DEFENDANT SEARS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR *REMITTITUR*, ON DAMAGES

Richard D. Harris (IL Bar No. 1137913)
Mark R. Galis (IL Bar No. 6206938)
Jeffrey G. Mote (IL Bar No. 6243534)
Cameron M. Nelson (IL Bar No. 6275585)
GREENBERG TRAURIG LLP
77 West Wacker Drive
Suite 2500
Chicago, Illinois  60601
(312) 456-8400

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................1

II.    Legal Standards Under Fed. R. Civ. P. 50 and 59 ..............................................3

III.   ARGUMENT ........................................................................................................5

   A.  SEARS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE
      THERE WAS INSUFFICIENT EVIDENCE THAT SEARS CAUSED RRK'S
      ALLEGED DAMAGES. ..........................................................................................5

      1.  RRK Provided Insufficient Evidence That Sears' Alleged Misappropriation
          Caused Its Claimed Damages. ......................................................................6

      2.  Both Of RRK's Damages Theories Are Legally Defective Because Neither
          Was Limited To A "Head Start" Period. ......................................................9

      3.  RRK's Expert's Opinions On Damages Were Based On Unreliable
          Methodology And Unreasonable Assumptions That Could Not Provide A
          Rational Basis Ror Awarding Damages. ....................................................17

      4.  RRK's Expert Failed To Apportion Damages To Just Those Associated With
          The Trade Secret Components. ...................................................................21

      5.  RRK's Lost Profits Damages Were Cut Off In July 2002 When Dremel
          Entered The Market With An Acceptable Alternative Rotary Cutting
          Tool/Plunge Attachment Product. ..............................................................23

   B.  ALTERNATIVELY, SEARS IS ENTITLED TO A NEW TRIAL BECAUSE
      THE JURY'S DAMAGES AWARD WAS EXCESSIVE AND CLEARLY THE
      PRODUCT OF CONFUSION, PASSION AND PREJUDICE .......................................24

      1.  The Jury's Damages Award Improperly Includes Non-Trade-Secret
          Components Of Its All-In-One Cutting Tool Kit And Was Not Limited To
          The "Head Start" Period. ..........................................................................25

      2.  Sears Is Entitled To A New Trial Because The Jury Should Have Been
          Instructed To Apply A "Head Start" Limitation Period And To Apportion
          Profits To Just Those Associated With The Trade Secret Misappropriation...............28

      3.  Sears Is Entitled to A New Trial Or An Order of *Remittitur* Because The
          Damages Award Is Excessive, Against The Clear Weight Of The Evidence
          And Depends On Improper Evidence. .......................................................29

IV.   CONCLUSION...................................................................................................31

**Federal Cases**

489 U.S. 141, 160 (1989) ........................................................................................... 14

Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980) ....................................... 3

Alphamed Pharms. Corp. v. Arriva Pharms., Inc., 432 F. Supp. 2d 1319, 1355-1356 (D. Fla. 2006) ................................................................................................... 23, 28

Am. Can Co. v. Mansukhani, 742 F.2d 314, 334 n.24 (7th Cir. 1984) ....................... 11

Briggs v. Marshall, 93 F.3d 355, 360 (7th Cir. 1996) ................................................... 3

Cognis Corp. v. Chemcentral Corp., 430 F.Supp.2d 806, 812 (N.D.Ill. 2006) ........... 13

Compco Corp . v. Day-Brite Lighting, Inc., 376 U.S. 234, 237-238 (1964) ................ 14

Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000) .......... 18

Cosgrove v. Bartolotta, 150 F.3d 729, 732 (7th Cir. 1998) ........................................... 4

Cygnar v. City of Chicago, 865 F.2d 827, 847 (7th Cir. 1989) ..................................... 4

EFCO Corp. v. Symons Corp., 219 F.3d 734, 740 (8th Cir. 2000) ......................... 5, 14

Emmel v. Coca-Cola Bottling Co, 95 F.3d 627, 629 (7th Cir. 1996) ............................ 3

Felton v. Spiro, 78 F. 576, 582 (6th Cir. 1897) ............................................................. 4

Forest Laboratories, Inc. v. Formulations, Inc., 299 F. Supp. 202, 207 (E.D. Wis. 1969) ........... 11

Forest Laboratories, Inc. v. Pillsbury Co., 452 F.2d 621, 624 n.4 (7th Cir. 1971) ...................... 12

Gile v. United Airlines, Inc., 213 F.3d 365, 375 (7th Cir. 2000) ................................. 28

Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341, 1353 (Fed. Cir. 1999) ................................................................................................................. 24

Haluschak v. Dodge City of Wauwatosa, Inc., 909 F.2d 254, 257 (7th Cir. 1990) ..................... 28

Harper v. Albert, 400 F.3d 1052, 1061 (7th Cir. 2005) ................................................. 3

K-2 Ski Co. v. Head Ski Co., 506 F.2d 471, 474-75 (9th Cir. 1974) ........................... 11

Kewanee v. Bicron, 416 U.S. 470, 476 (U.S. 1974) ............................................... 13, 14

Kohler Co. v. Moen, Inc., 12 F.3d 632, 639 (7th Cir. 1993) ....................................... 14

i

Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 727 n.6 (7th Cir. 2003) ....... 13

Matter of Innovative Construction Systems, Inc., 793 F.2d 875, (7th cir. 1986) ........................... 4

Medcom Holding Co. v. Baxter Travenol Lab., 106 F.3d 1388, 1397 (7th Cir. 1997) .................. 4

Meterlogic, Inc. v. KLT, Inc., 368 F.3d 1017, 1019 (8th Cir. 2004) ........................................... 18

Miksis v. Howard, 106 F.3d 754, 764 (7th Cir. 1997) .................................................................... 4

O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 399 F. Supp. 2d 1064 (D. Cal. 2005) ........ 5, 6

Otis, 1998 WL 673595 .................................................................................................................. 20

Pagan v. Shoney's, Inc., 931 F.2d 334, 338 (5th Cir. 1991) ........................................................... 4

Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F. 2d 1152, 1156 (6th Cir. 1978) .................... 24

Polk v. Mongomery County, 875 F.2d 316, 316 (4th. Cir. 1989) .................................................... 4

Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1549 (Fed. Cir. 1995) ........................................... 21

Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415 (7th Cir. 1992) .............. 17, 21, 26

Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 229 (1964) ................................................... 14

Shushereba v. R.B. Industries, Inc., 104 F.R.D. 524, 529 (W.D. Pa. 1985) ................................. 28

Sims v. Mulcahy, 902 F.2d 524, 533 (7th Cir. 1990) .................................................................... 28

SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 926 F. 2d 1161, 1165 (Fed. Cir.1991)
.................................................................................................................................................... 24

Softel, Inc., v. Dragon Medical And Scientific Communications Ltd., 891 F. Supp. 935 , 943
(S.D. NY 1995) .......................................................................................................................... 21

Sokol Crystal Products, Inc. v. DSC Communications Corp., 15 F.3d 1427, 1433 (7th Cir. 1994)
.................................................................................................................................................... 10

State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F. 2d 1573, 1577 (Fed. Cir. 1989) ........... 24

Taliferro v. Augle, 757 F.2d 157, 162 (7th Cir. 1985) ................................................................. 25

Thomas v. Stalter, 20 F.3d 298, 303 (7th Cir. 1994) .................................................................... 28

Turner v. Miller, 301 F.3d 599, 602 (7th Cir. 2002) ....................................................................... 3

University Computing Co. v. Lykes--Youngstown Corp., 504 F.2d 518, 539 (5th Cir. 1974) .... 21

Vermont Microsystems v. Autodesk, Inc., 138 F.3d 449, 452 (2d Cir. 1998) ........................... 5, 9

Williams v. Nichols, 266 F.2d 389, 393 (4th Cir. 1959) ................................................................. 4

Zazu Designs v. L'Oreal, 979 F.2d 499, 505-06 (7th Cir. 1992) .................................................. 25

Zenith Elec. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 420-21 (7th Cir. 2005) .................. 19

**State Cases**

04 C 3944 ....................................................................................................................................... 1

Brunswick Corp. v. Outboard Marine Corp., 404 N.E.2d 205, 207 (Ill. 1980) ........................... 10

ILG Indus. Inc. v. Scott, 273 N.E. 2d 393, 397 (Ill. 1971) ......................................................... 11

Nat'l Rejectors, Inc. v. Coin Acceptors, Inc., 409 S.W.2d 1, 44 (Mo. 1966) .............................. 12

R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc., No. 99 C 1174, 2004 WL
     1613563, at *8 (N.D. Ill. July 19, 2004) .................................................................................. 21

Rockwell Graphic Sys., Inc. v. DEV Indus., Inc., No. 84 C 6746, 1993 WL 286484, at *2-6
     (N.D. Ill. Jul. 29, 1993) ............................................................................................................. 11

Schulenberg v. Signtrol, 212 N.E. 2d 865, 869 (Ill. 1965) ........................................................... 11

Televation Telecomm. Sys. v. Saindon, 522 N.E. 2d 1359, 1366 (Ill. App. Ct. 1988) ........... 9, 11

**State Statutes**

765 ILCS  1065/4 (West 2007) ......................................................................................... 10, 12, 25

Illinois  60601 ............................................................................................................................... 32

Illinois 60603 ................................................................................................................................. 33

Wis. STAT. § 134.90 (2006) ......................................................................................................... 12

Wisconsin and Illinois (See Mo. REV. STAT. § 417.457 (2007) ................................................. 12

**State Rules**

Federal Rule of Civil Procedure 50(b) ........................................................................................... 1

Federal Rule of Civil Procedure 59 ................................................................................................. 1

CHI 56872028v3 12/5/2007

Defendant Sears, Roebuck and Co. ("Sears") renews its motions for judgment as a matter of law ("JMOL") on the damages verdict for Plaintiff RRK Holding Company ("RRK") pursuant to Federal Rule of Civil Procedure 50(b).  In the alternative, Sears moves for a new trial or for an order of *remittitur* pursuant to Federal Rule of Civil Procedure 59.

## I.      INTRODUCTION

During trial, Sears moved for judgment as a matter of law pursuant to Rule 50(a) that RRK's damages theories were legally defective because they were not limited to a "head start" period and because RRK failed to provide sufficient evidence for a reasonable jury to find that any damages were caused by Sears' alleged misappropriation.  (See Dkt. No. 273 and 277) Sears' Rule 50(a) motions challenged both the sufficiency of the evidence offered by RRK in support of its damages claims and the legal bases for those claims.  The Court denied these motions and turned the case over to the jury.  (Dkt. No. 280)

Roto Zip's owner, Robert Kopras, disclosed a design for a single-shaft plunge router handle attachment to Sears' employee, Ray Holbrook, during a meeting in March 1999.  (Tr. 97-100)[1]  At that meeting, Mr. Kopras provided drawings of a "mini router" tool and showed a prototype single-handle, single-post plunge base accessory.  (Id.)  Plaintiff argues that the entire concept of a plunge base accessory for a "spiral saw," "rotary saw," or rotary cutting tool was a trade secret.  (Tr. 9-11, 18, 203)  RRK argued that circumstantial evidence established that Mr. Holbrook must have disclosed the concept of a plunge base accessory to Sears Canada's tool buyer, Ralph Jones, who, in turn, disclosed it to a tool manufacturer in China, Choon Nang.  (Tr. 14-15)  The only circumstantial evidence offered to support this argument was the fact that Mr. Jones and Mr. Holbrook occasionally talked about tool products that were already on the market. (Id.)

---

[1] Sears has submitted trial transcripts and exhibits in support of their post-trial motions in a separate paper filing.

CHI 56872028v3 12/5/2007

RRK offered damages evidence through its expert, Joseph Gemini, who testified that Roto Zip had suffered actual losses in the amount of $11,229,798 ($8,016,731 associated with lost profits on lost sales to Sears and $3,213,067 for lost profits on lost sales to Home Depot). Mr. Gemini also testified that RRK was entitled to recover unjust enrichment damage in the amount of $16,856,432, which included all of Sears' profits on the All-In-One Cutting Tool kits for more than three years. With respect to the period used for RRK's damages calculations, Mr. Gemini's lost profits calculation continued through July 2003, when Roto Zip sold substantially all of its assets to Bosch. For his unjust enrichment calculation, however, the damages period extended through February 2005. Tellingly, Mr. Gemini admits that neither of RRK's damages theories is limited to a "head start" period necessary to reverse engineer the alleged trade secret, despite undisputed evidence that the trade secret was publicly disclosed on August 12, 2001, at the Chicago Hardware Show -- almost two months before Sears sold its first All-In-One Cutting Tool Kit.[2] Moreover, RRK offered no evidence of an appropriate "head start" period.

Nevertheless, on November 19, 2007, the jury returned a verdict in favor of RRK on its trade secret misappropriation and breach of contract claims and awarded RRK the following damages: (1) $11,664,105 for actual loss[3]; (2) $1,668,136 for unjust enrichment not included in RRK's actual losses; and punitive damages of $8,011,344. (Dkt. No. 283) The Court subsequently entered judgment for RRK in the amount of $21,363,585. (Dkt. No. 287)

Sears is entitled to judgment as a matter of law because RRK's damages numbers were legally defective and because RRK failed to present evidence sufficient to allow a reasonable

---

[2] RRK has asserted throughout this lawsuit that Illinois law does not recognize a "head start" period limitation for calculating damages under either an actual loss or unjust enrichment theory. See Plaintiff's Trial Brief at p. 15, Dkt. No. 194, Ex. I(1); RRK Response to Sears' Motion to Exclude Gemini Test. pp. 14-15, Dkt. No. 93; Plaintiff's Motion to Compel at pp. 3, 4, 7, 8, Dkt. No. 238; Plaintiff's arguments at jury instruction conference, Tr. at p. 1320.

[3] The jury apparently based its $11,664,105 lost profits number on an error in Schedule 6 of Gemini's expert report (See D. Ex. 194) instead of using the $11,229,798 amount he testified to at trial.

jury to determine damages under either its lost profits or unjust enrichment theories. Alternatively, the Court should order a new trial, or enter an order for *remittitur* because the jury's damages award was excessive, not based on any rational connection to the evidence, and the obvious product of confusion, passion and prejudice.

## II.   LEGAL STANDARDS UNDER FED. R. CIV. P. 50 AND 59

When considering a motion to enter judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), this Court should consider "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Emmel v. Coca-Cola Bottling Co*, 95 F.3d 627, 629 (7th Cir. 1996). This Court should reverse the jury's verdict under Rule 50 if no rational jury could have found for the prevailing party. *Turner v. Miller*, 301 F.3d 599, 602 (7th Cir. 2002); *see also Harper v. Albert*, 400 F.3d 1052, 1061 (7th Cir. 2005) (Judgment as a matter of law must be granted where "no reasonable jury could have found for [plaintiffs] on each essential element of their claim.").

When made after the jury has returned its verdict, a Rule 50 motion may be joined with a motion for a new trial under Rule 59. Fed. R. Civ. P. 50(b). Rule 59(a) allows the Court to grant a new trial if the "verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Briggs v. Marshall,* 93 F.3d 355, 360 (7th Cir. 1996). The decision to grant or deny a new trial is within the sound discretion of this Court and, unlike the standard for determining judgment as a matter of law, the Court need not view the evidence in the light most favorable to RRK. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). When a Rule 59 motion is based on excessive damages, the jury's award may be vacated and a new trial granted if the verdict is monstrously excessive, a product of confusion, passion and prejudice, or if there is no rational connection between the evidence on

damages and the verdict. *Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989). All three bases apply to this verdict.

Finally, the court may alter or amend the jury's verdict pursuant to Fed. R. Civ. P. 59(e) if the jury committed a manifest error of law or fact. *Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998); *Arifin v. Matuszewich*, 2000 U.S. Dist. LEXIS 8624 (N.D. Ill. 2000). The court is granted wide discretion when it considers a motion for *remittitur. See Medcom Holding Co. v. Baxter Travenol Lab.*, 106 F.3d 1388, 1397 (7th Cir. 1997) (motion for new trial on damages); *Miksis v. Howard*, 106 F.3d 754, 764 (7th Cir. 1997) (motion for new trial on damages and *remittitur*). In contrast to directed verdicts and judgments notwithstanding verdicts, which use the "light most favorable to the nonmovant" standard, for the purposes of a motion for new trial the Court exercises its own independent judgment after a weighing of all the evidence and any other pertinent factors in determining whether the verdict is against the clear weight of the evidence or would result in a miscarriage of justice. *Williams v. Nichols*, 266 F.2d 389, 393 (4th Cir. 1959); *see also Polk v. Mongomery County*, 875 F.2d 316, 316 (4th. Cir. 1989); *Pagan v. Shoney's, Inc.*, 931 F.2d 334, 338 (5th Cir. 1991); *Felton v. Spiro*, 78 F. 576, 582 (6th Cir. 1897). Nevertheless, the Court has discretion to grant a new trial if the verdict appears against the weight of the evidence. *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 106 F.3d 1388, 1397 (7th Cir. 1997). For example, in *Matter of Innovative Construction Systems, Inc.*, 793 F.2d 875, (7th cir. 1986), the Seventh Circuit confirmed that the district court correctly granted a Defendant's motion for a new trial because the expert testimony on which the jury's award was based was "virtually without foundation." 793 F.2d at 888-89. Similarly, in *Mid-America Tablewares,* the Seventh Circuit ordered a new trial because the jury's damage award found no rational basis in the evidence. 100 F.3d at 1367. In particular, the Court found that the

jury unreasonably relied on the testimony of an evidence expert whose opinion on lost profits was based upon an "extreme degree of speculation ... resting on one speculative inference heaped upon another." *Id.* at 1368. For example, the damages expert assumed steady annual sales, despite a declining sales history, and the expert's figures did little more than adopt the plaintiff's own biased sales projections. *Id.*

## III.  ARGUMENT

### A.  SEARS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE THERE WAS INSUFFICIENT EVIDENCE THAT SEARS CAUSED RRK'S ALLEGED DAMAGES.

Sears is entitled to judgment as a matter of law on RRK's damages claims because the jury had insufficient evidence, or lacked a reasonable basis, to determine RRK's damages. The formula used to calculate damages in a trade secrets case is a question of law. *See Vermont Microsystems v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998). A trade secret claimant must prove his damages were causally related to the defendant's misconduct. *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 740 (8th Cir. 2000) (applying UTSA).

In *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (D. Cal. 2005) the plaintiff claimed several trade secrets, and the plaintiff's damages expert presented a calculation which assumed that the defendant had misappropriated all of plaintiff's trade secrets. After the jury concluded that the defendant had misappropriated some but not all of the alleged trade secrets, the Court granted defendant's Rule 50 motion on the grounds that the proffered expert testimony was useless to the jury. *Id.* at 1077. The court reasoned that the jury had insufficient evidence, or lacked a reasonable basis, to apportion the unjust enrichment damages. *Id.* After concluding that the jury's unjust enrichment verdict had not been proved, the court awarded plaintiff a reasonable royalty in the form of a one-time lump sum payment based on a section of the California UTSA, that is virtually identical to that of Illinois, providing that "[i]f

neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited." *Id.* at 1078.

As set forth in the following sections, Sears is entitled to judgment as a matter of law on RRK's damages claims because (1) RRK offered insufficient evidence that Sears' alleged trade secret misappropriation caused its damages; (2) RRK's expert failed to limit the period for calculating damages to the "head start" period; (3) RRK's expert's opinions were the product of unreliable methodology and unreasonable assumptions; (4) RRK failed to apportion profits to just those associated with Sears' alleged unlawful conduct; and (5) RRK's lost profits damages were cut off as a matter of law in July 2002 when Dremel entered the market with its rotary cutting tool/plunge base product.

## 1. RRK Provided Insufficient Evidence That Sears' Alleged Misappropriation Caused Its Claimed Damages.

RRK offered virtually no, let alone sufficient, evidence that its damages were caused by Sears' alleged trade secret misappropriation. On the other hand, there is ample evidence that Sears' profits, and RRK's lost profits, are attributable to other factors, including the undisputed evidence that:

- the accused products were sold and marketed under the Sears Craftsman® brand, in Bob Vila infomercials and using Sears' nationwide distribution network; (Tr. 361, 758)

- the Craftsman® All-In-One Cutting Tool Kit sold at an average price of about $57/unit, just over half the price RRK indicated that it would have ever sold the alleged trade secret product to Sears ($102 according to Mr. Gemini) and just over a third of the price at which RRK sold a combination Spiral Saw/plunge base/Zip Mate kit to Lowes (approximately $151); (Tr. 703, 1112)

- Sears would never have purchased the rotary cutting tool/plunge router attachment offered by Roto Zip at a price requiring it to sell at retail for greater than $99 let alone the $129/unit price that RRK claimed in presenting its damages case; (Tr. 394, 424, 426, 429, 574)

- Home Depot's customers preferred a DeWalt rotary cutting tool and were highly price sensitive to differences as small as $10 between competing tools; (Tr. 804-806, 815-820, 844; D. Ex. 69); and

- Roto Zip's sales declined every year between 2000-2003 (Tr. 690), and its retail customers were abandoning it because of a significant Consumer Product Safety Commission recall effecting 1.9 million Spiral Saws sold between 1999 and 2002, declining sales, product quality issues and competing products. (Tr. 784, 789, 806-809, 816-817, 827-831, 834-835; D. Exs. 23, 29, 269)

Likewise, RRK provided no customer surveys, market studies or testimony from marketing experts indicating that it was the inclusion of a plunge base accessory, as opposed to the tool itself, or, in the case of Sears' product, the inclusion of other accessories in the kit such as the handle attachment, circle cutter, straight edge attachment, fixed base attachment, collet wrench or bits, that drove the sales of the Craftsman® All-In-One Cutting Tool Kit. In sum, RRK offered no evidence that consumers purchased Sears' product because of the alleged trade secret component, as opposed to the substantially lower price or any number of other factors, including the various other components included in the All-In-One Cutting Tool Kit.

RRK was not willing to lower the price on its rotary cutting tool or its plunge base accessory. (Tr. 815, 847) RRK's products were highly sensitive to even small price changes. (Tr. 795, 804-806, 815-820, 844; D. Ex. 69) For example, RRK's former Vice President of Sales, Craig Rae, confirmed that, as of May of 2001, sales of Rotozip brand products were down by 50% at Sears compared to the prior year. (Tr. 792-795; D. Ex. 23) He further testified that one particular product, the ZMRebel, enjoyed significant improvement in sales when its price was reduced from $129 to $119, but that comparative sales declined by about 50% when the price returned to $129. (Tr. 794-95) Mr. Rae also testified that consumers preferred a DeWalt brand tool at $79, over a Rotozip brand tool at $89, even though the Rotozip brand tool allegedly "cuts wood, tile, plexiglass, drywall, acoustic tile … [and] has a handle and a case." (Tr. 811). The DeWalt brand tool so outsold the Rotozip brand tool that Home Depot discontinued selling

7

that Roto Zip tool. (Tr. 804). This scenario is particularly probative of causation -- consumers were willing to forego all of the supposed advantages of Rotozip brand tools for a mere $10 price differential. (Tr. 795, 804-806, 815-820, 844) And by mid-2001, Roto Zip had already lost the below-$100 market to competitors. (Tr. 805).

The average sales price for the Sears' All-In-One Cutting Tool was about $57 as a kit that included several accessories. (Tr. 703, 1112) That kit was even priced lower than the bare tool, which was usually offered by Sears for $79, except for occasional Sears' promotions. (Tr. 961-962) In fact, Sears offered its standalone All-In-One Cutting Tool for about $79/unit, almost $20/unit higher than the entire kit, to drive the sales of the kit as a better value and to allow Sears to make money selling the standalone All-In-One Cutting Tool during Sears' half price Saturday sales events. (Tr. 961-62) RRK's plunge base accessory alone sold for as much as Sears' entire All-In-One Cutting Tool Kit and RRK could not lower the price. (Tr. 847) A comparable kit from Roto Zip would have been priced at $129 (for just a tool with a plunge base, and no other accessories) at Sears, or even $229 (for a tool with a plunge base, Zip Mate, and other accessories) at Home Depot. (Tr. 808, 814-15) Given the evidence that customers were prepared to abandon the Roto Zip brand name for a mere $10 price differential, the much larger price differential for Sears' product strongly suggests that customers bought Sears Craftsman® All-In-One Cutting Tool **because of its low price** -- regardless of the accessories included in the kit.

Without any evidence that customers bought the Sears product kit because of the plunge base accessory, RRK could not meet its burden of proving that Sears' allegedly wrongful conduct caused its claimed lost sales or unjust enrichment damages. Moreover, the weight of the evidence demonstrates that RRK would have lost sales to Sears regardless of the accessories in Sears' All-

In-One Cutting Tool kit and that neither Sears nor Home Depot would have purchased the combination tool kit from RRK.

2. **Both Of RRK's Damages Theories Are Legally Defective Because Neither Was Limited To A "Head Start" Period.**

Sears is also entitled to judgment as a matter of law on RRK's damages claims which were legally defective because they were not limited to the "head start" period. The appropriateness of a damages calculation is a question of law for the court. *Vermont Microsystems v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998) (recognizing that the appropriateness of a formula used to calculate damages in a trade secret case is a question of law). The damages numbers RRK presented to the jury under its lost profits and unjust enrichment theories were legally defective and grossly inflated because, among other reasons, neither was limited to the period of time it would take a competent tool manufacturer to reverse engineer and come to market with a competing product -- i.e., a "head start" period.[4] Under Illinois law, the reverse engineering or "head start" period is the length of time it would take a "legitimate competitor" to reverse engineer the trade secret product after public disclosure. *Brunswick Corp.*, 404 N.E. 2d at 207. *See also, Television Telecomm. Sys. v. Saindon*, 522 N.E. 2d 1359, 1366 (Ill. App. Ct. 1988) (defining a legitimate competitor in a trade secret misappropriation case as one who is "competent in his particular field"). Because trade secret protection ends once the trade secret is publicly disclosed -- or, in other words, no longer a secret -- damages associated with a trade secret that has been publicly disclosed are limited to the period that it would take a legitimate competitor to copy or reverse engineer the trade secret.

a. The "causation" requirement in the Illinois Trade Secret Act requires the application of a "head start" period to limit the

---

[4] Throughout this lawsuit, RRK has repeatedly argued that "there is simply no 'head start' limitation period for the calculation of damages in the state of Illinois." (See Plt. Trial Br. at 15, Dkt. No. 194; Plt. Mtn. to Compel, Dkt. No. 239 at 5.) RRK is wrong and this error is fatal to its lost profits and unjust enrichment damages theories.

damages period where a trade secret embodied in a product design was voluntarily disclosed.

Under well established law in Illinois and other UTSA jurisdictions, a plaintiff may only recover damages incurred or caused by the defendant's misappropriation. Section 4 of the Illinois Trade Secret Act ("ITSA") provides that a plaintiff is "entitled to recover damages for misappropriation. Damages can include both actual loss **caused by misappropriation** and the unjust enrichment **caused by misappropriation** that is not taken into account in computing actual loss." 765 ILCS 1065/4 (West 2007). Interpreting the identical section of the UTSA adopted by Wisconsin, the Seventh Circuit confirmed that the "causation" prerequisite requires a "head start" period limitation to damages claims in circumstances where the trade secret was voluntarily, publicly disclosed. *Sokol Crystal Products, Inc. v. DSC Communications Corp*., 15 F.3d 1427, 1433 (7th Cir. 1994) ("[O]nce the defendant has discovered, or would have discovered, the trade secret without the misappropriation, any lost profits from that time forward are not caused by defendant's wrongful act.").

The Illinois Supreme Court has also applied a "head start" limitation numerous times to limit the duration of a trade secret injunction. In *Brunswick Corp. v. Outboard Marine Corp*., 404 N.E.2d 205, 207 (Ill. 1980), the Court rejected the plaintiff's plea for a ***permanent*** injunction, noting that such relief "would, if the secret were lawfully discoverable, give to the plaintiff a windfall protection and would subvert the public interest in fostering competition." *Id*. (emphasis added). Thus, the Court concluded:

> [by] enjoining the use of wrongfully acquired trade secrets for the approximate length of time it would require a legitimate competitor to develop a competitive product following a lawful disclosure of the information, the wrongdoer is deprived of any advantage from his wrongdoing [and] the developer of the trade secret is placed in the same position it would have occupied if the breach of confidence had not occurred. *Id*.

10

Numerous other Illinois cases confirm the need to limit damages to the period of time during which the defendant enjoyed a competitive advantage gained by using the trade secret. *See e.g.*, *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, No. 84 C 6746, 1993 WL 286484, at \*2-6 (N.D. Ill. Jul. 29, 1993) (compensating for injuries beyond the "head start" period would give the plaintiff a windfall, putting it in a better position than it would have been in if the misappropriation had never occurred); *ILG Indus. Inc. v. Scott*, 273 N.E. 2d 393, 397 (Ill. 1971) (affirming an injunction of 18 months because the expert testimony supported that this was the amount of time that it would have taken the defendants to lawfully produce the product through reverse engineering); *Schulenberg v. Signtrol,* 212 N.E. 2d 865, 869 (Ill. 1965) (reversing the issuance of a permanent injunction and remanding to the lower court to determine how long it would have taken for the defendants to lawfully produce the product through reverse engineering); and *Televation Telecomm. Sys. v. Saindon*, 522 N.E. 2d 1359, 1366 (Ill. App. Ct. 1988) (defining a legitimate competitor in a trade secret misappropriation case as one who is "competent in his particular field").

In *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 334 n.24 (7th Cir. 1984), the Seventh Circuit again articulated why the "head start" limitation to trade secret damages is required, stating:

> "Plaintiff is not entitled to protection from defendants' inks that are reverse engineered or independently derived from public information or [defendant's] own skill, knowledge and experience. Reverse engineering (or chemical analysis) appears to be a relatively simple task in this field, and the extent of public information appears to make trade secrets in this field very fragile and short-lived creations. Although the possibility of reverse engineering or independent development does not excuse one who obtains trade secrets wrongfully, it places limits on the plaintiff's protectible interest and on the appropriate scope of relief."

*Id.* at 334 n. 24; *citing K-2 Ski Co. v. Head Ski Co*., 506 F.2d 471, 474-75 (9th Cir. 1974); *Forest Laboratories, Inc. v. Formulations, Inc*., 299 F. Supp. 202, 207 (E.D. Wis. 1969) (Wisconsin

courts would not find liability after life of trade secret had expired), *aff'd in relevant part, Forest Laboratories, Inc. v. Pillsbury Co.*, 452 F.2d 621, 624 n.4 (7th Cir. 1971).

> b.      The comments to both the UTSA and Restatement of Unfair Competition expressly require the application of a "head start" period to limit the damages period where a trade secret embodied in a product design was voluntarily disclosed.

The comments to the Uniform Trade Secrets Act ("UTSA") clearly limit trade secret remedies, including those measured by the defendant's unjust enrichment, to the period of time it would require a competitor to reverse engineer the secret:

> "[like] injunctive relief, a monetary recovery for trade secret misappropriation is appropriate only for the period in which information is entitled to protection as a trade secret, plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of the misappropriation. Actual damage to a complainant **and** unjust benefit to a misappropriator are caused by misappropriation **during this time alone**." (emphasis provided)

Commissioners' Comments, Uniform Trade Secrets Act, § 3, 546-557 (1985); *see also US. Gypsum Co. v. Lafarge N. Am., Inc.*, 2007 U.S. Dist. LEXIS 25586, *41 (N.D. Ill. 2007). Virtually all states adopting the UTSA, including Missouri, Wisconsin and Illinois (See Mo. REV. STAT. § 417.457 (2007); Wis. STAT. § 134.90 (2006); 765 ILL. COMP. STAT. 1065/4 (2007)) limit trade secret enforcement to the period in which the plaintiff was damaged by the defendant's ability (through misappropriation) to dispense with the need for reverse engineering. *See Nat'l Rejectors, Inc. v. Coin Acceptors, Inc.*, 409 S.W.2d 1, 44 (Mo. 1966) (stating the "proper measure of damages is the loss to [plaintiff due to misappropriation] based upon the profits [the plaintiff] lost by reason of the competition of defendant . . . during the time that company would not otherwise have been in the production of the devices at issue") (emphasis added).

Likewise, courts applying the ITSA have also looked to the Restatement of Unfair

Competition ("the Restatement") for guidance in trade secret cases. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 727 n.6 (7th Cir. 2003); *Cognis Corp. v. Chemcentral Corp.*, 430 F.Supp.2d 806, 812 (N.D.Ill. 2006). Comment h to § 45 of the Restatement explicitly supports limiting lost profits and unjust enrichment damages to a "head start" period, stating:

> h. Limitation on monetary relief. Monetary remedies, whether measured by the loss to the plaintiff or the gain to the defendant, are appropriate only for the period of time that the information would have remained unavailable to the defendant in the absence of the appropriation. This period may be measured by the time it would have taken the defendant to obtain the information by proper means such as reverse engineering or independent development. Similarly, the issuance of a patent or other public disclosure of the information by the plaintiff or a third person terminates the secrecy necessary to the protection of the trade secret. Monetary relief based on the defendant's use of the information after the loss of secrecy is therefore appropriate only to the extent necessary to remedy a **head start** or other unfair advantage attributable to the defendant's prior access to the information. The limitations on the appropriate duration of injunctive relief as stated in § 44, Comment f, are thus also generally applicable to the calculation of monetary relief. (emphasis provided)

Accordingly, fundamental causation principles applicable to the remedial provisions of the UTSA and Restatement require the application of a "head start" limitation in this case.

        c.     The Supremacy Clause requires application of a "head start" limitation to avoid conflict with the policies of the federal patent system.

Trade secret law may not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is, by starting with the known product and working backward to divine the process which aided in its development or manufacture. *Kewanee v. Bicron*, 416 U.S. 470, 476 (U.S. 1974). This would conflict with one of the policies of the federal patent laws: "that which is in the public domain cannot be removed therefrom by action of the States." *Id. citing Lear, Inc. v. Adkins*, 395 U.S., at 668 ("Federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent."); *Goldstein v. California*, 412 U.S., at

570-571; *Sears, Roebuck & Co*. v. *Stiffel Co*., 376 U.S. 225, 229 (1964); and *Compco Corp . v. Day-Brite Lighting, Inc*., 376 U.S. 234, 237-238 (1964).

In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc*., the Supreme Court struck down a Florida trade secret law that impinged upon the federal patent framework by, in essence, prohibiting "the entire public from engaging in a form of reverse engineering of a product in the public domain." 489 U.S. 141, 160 (1989), *see Kohler Co. v. Moen, Inc*., 12 F.3d 632, 639 (7th Cir. 1993) (analyzing *Bonito Boats* and cases cited therein and concluding that the Supreme Court held in each case "that a state's unfair competition laws [cannot] extend patent-like protection to otherwise unprotected designs because such protection conflict[s] with the federal policy expressed in the [Constitution's] patent clause and patent laws of generally free trade in unpatented design and utilitarian concepts"). As such, where a trade secret holder brings to the market a device that may be reverse engineered, the holder is only entitled to enforce protection of the trade secret until such time as the secret could be discovered through "fair and honest means." *Kewanee*, 416 U.S. at 476. Thus, in addition to the "causation" requirement, federal preemption and the Supremacy Clause also require a "head start" limitation to prevent states from providing patent-like rights to trade secret owners by extending the period for recovering trade secret misappropriation remedies into the period exclusively covered by the federal patent statutes.

    d.  RRK offered no evidence concerning the appropriate "head start" period.

RRK has the burden of proving its case, which includes the burden of proving that it was injured by Sears' alleged trade secret misappropriation. *EFCO Corp. v. Symons Corp*., 219 F.3d 734, 740 (8th Cir. 2000) (applying UTSA and finding that a trade secret plaintiff must prove his damages were causally related to the alleged misconduct). RRK introduced no evidence at all

14

regarding the "head start" Sears purportedly enjoyed as a result of its alleged misappropriation. Instead, RRK's expert, Mr. Gemini, provided only two calculations -- a lost profits calculation through July, 2003 (cut-off by the date on which RRK sold its assets to Bosch), and an unjust enrichment calculation that continued through February 2005. Thus, RRK failed to provide the jury with sufficient evidence to allow it to rationally fashion a legally cognizable damages award.

> e.    The trade secret ceased to exist when RRK voluntarily, publicly disclosed its new single-handle, plunge router attachment at the 2001 Chicago Hardware Show.

It is undisputed that RRK's alleged trade secret ceased to exist when it was disclosed at the Chicago Hardware Show on August 12, 2001. (See Tr. 507, 670) This undisputed fact required the application of a "head start" limitation to any trade secret damages. But Sears offered the only evidence at trial on the appropriate "head start" period. First, Sears' tool industry expert, Michael O'Banion, testified that it would take a competent tool manufacturer between 5 ½ - 8 months to reverse engineer the single-handle, single-post plunge base accessory, or the Sears' dual-handle, dual-plunge base attachment, and come to market with a competing rotary cutting tool/plunge router attachment product.[5]  (Tr. 1023-24) This was confirmed by Choon Nang's president, Steven Fong, who testified that he started designing the plunge base accessory, among other accessories for the All-In-One Cutting Tool, in March 2000, filed a design patent application on the dual-shaft, plunge base Choon Nang designed on June 30, 2000, and was ready to manufacture the plunge base accessory around August 2000 -- a period of about six months. (Tr. 880-882, 884) It is undisputed that in the years 1999-2001 numerous competitive cutting tools to the Spiral Saw® were available and had been on the market for

---

[5] Of course, no reasonable juror could conclude that Sears had derived its dual-handle, dual-post plunge base design from RRK's design and that is the subject of Sears' Rule 50/59 motion on liability, which was filed contemporaneously with this motion.

years, including products by Makita, DeWalt, Dremel, Freud, Ryobi, Porter Cable and Black & Decker. (See Tr. 742, 804, 934-936, 957, 999-1014) Thus, the only reverse engineering necessary to compete with the Roto Zip Spiral Saw/plunge base accessory was for the single-handle, single-plunge attachment accessory.[6] (See Tr. 785, 877, 1000-1007, 1023-1025) Gary Houck, co-founder and senior partner at Manufacturers Specialty Alliance ("MSA"), and who brought the All-In-One Cutting Tool kit to the attention of Sears, confirmed that he first saw the Choon Nang rotary cutting tool at the August 2000 Hardware Show in Chicago and had in his possession a prototype of the Choon Nang plunge attachment by December 2000. (Tr. 959-961)

As a matter of law, RRK's damages must be limited to only those accruing during the "head start" period -- the only period for which RRK could have been injured by the alleged "advantage" that Sears obtained by allegedly having access to and using the trade secret before it was publicly disclosed. While, the length of the applicable "head start" period is a question of fact, RRK provided no evidence to contradict that offered by Sears. Instead, RRK's counsel attempted to overcome this oversight through attorney argument at closing.

While RRK half-heartedly conceded during closing argument that a "head start" period might be necessary, Mr. Gemini's calculations did not allow the jury to calculate damages based on the only evidence of an appropriate "head start" period offered at trial. For example, even if the jury had concluded that the applicable "head start" period fell somewhere within the 5 ½ to 8-month period offered by Mr. O'Banion, RRK provided no basis for which they could calculate the amount of RRK's compensatory damages associated with that "head start" period. As such,

---

[6] RRK's counsel repeatedly sought to confuse the jury on this issue by suggesting that the time to develop the cutting tool was also a part of the reverse engineering period even though the undisputed evidence demonstrated existing suppliers of the rotary cutting tool component, including those offered by DeWalt, Ryobi, Dreme, Freud, Black & Decker and Makita, were already available on the market prior to Roto Zip's August 12, 2001, public disclosure of its Spiral Saw/plunge router attachment combination.

RRK failed to meet its burden of proving its alleged damages because it did not provide the jury with a rational basis for making a proper damages calculation.

### 3. RRK's Expert's Opinions On Damages Were Based On Unreliable Methodology And Unreasonable Assumptions That Could Not Provide A Rational Basis For Awarding Damages.

In addition to its failure to establish causation and limit its damages calculation to a "head start" period, the methodology employed by RRK's expert in calculating damages was unreliable as a matter of law because it failed to consider fundamental economic principles, is based on unsupported and unreasonable assumptions and relied on simplistic mathematical formulations that were inconsistent with the evidence. "[P]eople who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence." *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992).

> a. RRK's damages were inflated because it failed to consider the effect of "cannibalization" on RRK's sales of standalone Spiral Saws and Spiral Saw kits by sales of its combination Spiral Saw/plunge attachment kit.

RRK's damages expert, Mr. Gemini, in determining lost profits assumed that Roto Zip's sale of the Spiral Saw/plunge base accessory kit would have no effect on the sale of Roto Zip's spiral saw and other spiral saw kits. (Tr. 1115-1120, 1152-1153; see also D. Ex. 194) Thus, according to RRK's expert, each lost sale was an incremental sale realized by Roto Zip that would not reduce sales of other Roto Zip Spiral Saw products and Spiral Saw kits. (Tr. 1117-1119) In other words, Mr. Gemini assumed that purchases of the trade secret Spiral Saw®/plunge base accessory kit would have no effect on the sales of RRK's standalone Spiral Saw product or Spiral Saw kits. (Id.). Based on this assumption, Mr. Gemini testified that an additional 57,448 Spiral Saw/plunge base accessory kits would have been sold to Home Depot without any reduction in sales of the same combination tool to Lowes or other Roto Zip Spiral

Saws and Spiral Saw kits at Lowes, Home Depot and other tool retailers. (Tr. 540-541, 1115-1120; Gemini Rep., D. Ex. 194 at 9-10.) As Sears' damages expert pointed out, such an assumption is not only ridiculous, but resulted in a dramatically inflated damages number. (Tr. 1118, 1129) Expert opinions that fail to incorporate all aspects of economic reality should be excluded. *See, e.g.*, *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (finding that expert's testimony on damages "should not have been admitted because it did not incorporate all aspects of economic reality"); *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004) (excluding opinion where expert made assumptions inconsistent with reality and had no market research or data to support conclusions).

> b.　　RRK's damages were likely inflated by its failure to consider the effect of "price elasticity" in determining the number of units of lost sales to Sears.

In calculating RRK's lost profits based on lost sales to Sears, Mr. Gemini merely took Sears total sales revenue for sales of its All-In-One Cutting tool at an average price of about $57/unit and divided by the $129/unit price at which he assumed Sears would have retailed a Roto Zip combination product. (Tr. 1145-1148). In other words, Mr. Gemini fails to conduct a study to determine the appropriate price elasticity relative to this circumstance (e.g., the degree to which the number of products sold varies with changes in price), and merely holds Sears' revenues constant in determining the number of units RRK would have sold to Sears – a baseless assumption and inconsistent with evidence in the record related to the reaction of consumers to changes in the price of this type of product. (Tr. 1145-1146). Sears' damages expert, Craig Elson, illustrated how this assumption was unreasonable because it suggested that a tool priced at $2,740.22/unit and then divided by Sears actual sales revenue would result in the sale of about 10,000 units. That was directly contradicted by the evidence, which indicated the market was highly sensitive to even small price fluctuations let alone the more than 100% price increase

18

assumed by Mr. Gemini in calculating lost profits to Sears. (Tr. 1148) For instance, Craig Rae, Roto Zip's Vice President of Sales, testified that a mere $10/unit price differential between DeWalt's rotary cutting tool and Roto Zip's competing Rebel Spiral Saw was enough to wipe out sales of the Roto Zip product at Home Depot. (Tr. 804).[7]

> c.  RRK's damages were inflated by its selective and unsupported use of Lowe's sales data to determine the number of units of lost sales to Home Depot.

In determining RRK's alleged lost profits to Home Depot, Mr. Gemini determined the number of lost sales by using a ratio of Home Depot-to-Lowes sales of spiral saws and spiral saw kits in 2002 and then multiplying this ratio by the number of spiral saw/plunge router kits sold by Lowe's in 2002. (Tr. 539-540, 1120-1123) He then took the same 2002 sales numbers and multiplied by 40% to reflect that the business was sold in July 2003. (Id.) That is the sum total of his "analysis." That, however, is not enough – an expert's testimony cannot rest on the expert's "say-so rather than a statistical analysis." *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420-21 (7th Cir. 2005). First, Mr. Gemini offers no evidence that his analytical approach is accepted or reliable. An expert "must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable." *Id.* at 419. (excluding testimony where proffered expert failed even to discuss statistical or econometric means of measuring damages, invoking "intuition" rather than analytic strategies

---

[7] Mr. Rae further confirmed that "Sears had some success with the ZM Rebel at $119, but when they went back to $129, sales returned to -50% comps." Thus, indicating that the $10 increase on the $119 price, or an 8.4% price increase, resulted in a 50% decrease in RotoZip units sold. In contrast, Mr. Gemini increased Sears actual average retail price from $57 to $129 retail, a price increase of 126%, and calculated the resulting volume decrease to be only 56% (from 484,055 to 212,420 units). In other words, in contradiction of case facts and without any analysis to support the reasonableness of his assumptions, Mr. Gemini calculates damages by assuming that a "theoretical" price increase of 126% yields only a 56% unit decrease, whereas actual documents exhibit a far more drastic relationship and far lower damages. However, instead of performing an analysis to determine the proper relationship, Mr. Gemini made a speculative assumption regarding one of the most fundamental factors required for his damage opinion - how many units the plaintiff would have sold but-for the alleged misappropriation.

widely used by specialists in the social sciences); *Otis v. Doctor's Associates, Inc.* 1998 WL 673595, at *4 (N.D. Ill. 1998) (excluding expert testimony where plaintiff "made no showing that the formula and projected values [expert] relied on [were] accurate or [had] been tested for accuracy.").

Sears' expert testified that this calculation was unreasonable for two reasons: (1) there was no reasonable basis to use this ratio to predict the sales of a single product; and (2) there was no reasonable basis for assuming the same unit sales in 2003 as in 2002. With respect to the first error, Mr. Elson pointed out that the Roto Zip products used in the ratio included several products that were not sold at both Home Depot and Lowes. Mr. Elson further noted that the ratio number was almost cut in half when only identical product offerings were considered. (Tr. 1123) Second, Mr. Elson testified that it was unreasonable to assume the same sales in 2003 as for 2002 because RRK's records showed declining year-after-year sales every year between 2000 to 2003. (Tr. 1124, 1127-1128) Moreover, Mr. Elson confirmed that Roto Zip's actual sales records confirmed that sales of the Roto Zip combination product at Lowes dramatically dropped at Lowes between 2002 and 2003, even after factoring in that the 2003 records were limited to seven months of sales data. (Id.) Mr. Elson testified that this error alone inflated Mr. Gemini's lost profits calculation by more than $500,000. (Tr. 1129)

Other unreasonable assumptions by Mr. Gemini included: (1) no effect on sales of Roto Zip's combination product from the 2002/2003 CPSC recall. (Tr. 704, 834-835); (2) Sears would have purchased the combination product for a price requiring a retail price of $129/ unit (Tr. 701); and (3) Home Depot would have bought the combination product for $151/unit when Roto Zip's own Vice President of Sales confirmed that Roto Zip would never have sold that product for an amount below $160/unit. (Tr. 695, 814-815). In sum, Mr. Gemini's analytical "method" is

entirely made-up, completely untested, and based on unreasonable assumptions, which resulted in a greatly-inflated lost profits calculation.

> ### 4. RRK's Expert Failed To Apportion Damages To Just Those Associated With The Trade Secret Components.

RRK had the burden of proving its damages to a reasonable certainty but it offered no evidence to support its core assumption that the plunge base accessory drove the sales of (1) Sears' All-In-One Cutting Tool kits for its unjust enrichment calculation; (2) the Spiral Saw/plunge base/Zip Mate kit used for its Home Depot lost profits calculation; and (3) the Spiral Saw/plunge base kit used for its Sears lost profits calculation. *See Softel, Inc., v. Dragon Medical And Scientific Communications Ltd.,* 891 F. Supp. 935, 943 (S.D. NY 1995) ("In measuring defendants' profits, it is also appropriate to apportion damages based on the role plaintiff's trade secret played in the commercial success of defendants' product.") *citing University Computing Co. v. Lykes--Youngstown Corp.,* 504 F.2d 518, 539 (5th Cir. 1974).[8] Calculations of damages that fail to correct for salient factors, not attributable to the defendant's misconduct, are inadmissible. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992) (finding that damages expert "should have tried to separate the damages that resulted from the lawful entry of a powerful competitor . . . from the damages that resulted from particular forms of misconduct allegedly committed by that competitor"); *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99 C 1174, 2004 WL 1613563, at *8 (N.D. Ill. July 19, 2004) (excluding expert testimony where calculations suffered from "insurmountable" flaw, the failure to adjust damages to account for legal causes).

---

[8] Under analogous patent law principles, a patentee may obtain damages, in the form of lost profits or a reasonable royalty, on unpatented components sold with a patented apparatus under the "entire market value rule" only if the patentee presents sufficient evidence that it could reasonably expect sales of such unpatented components as well as of the patented and the patented component must be "the basis for customer demand or substantially create the value of the component parts." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). The "entire market rule" has typically not been applied where the patented and unpatented components are not part of a *single* machine *Id*.

Mr. Kopras conceded that Sears was free to sell everything included in the All-In-One Cutting Tool kit, including the cutting tool itself, handles, edge guide, circle cutter and collet wrench, except the plunge base attachment without violating his trade secret. (Tr. 123-125, 130-131) Thus, to determine lost profits associated with Sears' alleged unlawful conduct, RRK was obligated to present sufficient evidence to determine the portion of profits attributable to the trade secret, plunge base accessory, as opposed to the (a) cutting tool and Zip Mate attachment in its Home Depot lost profits calculation or (b) the cutting tool and various accessories sold along with the plunge attachment accessory in its Sears lost profits calculation. RRK offered no such evidence. Thus, there was no way for the jury to apportion the profits linked to Sears' alleged unlawful conduct from that attributable to lawful sales, such as those from the cutting tool itself, Zip Mate, and other non-trade secret accessories. Moreover, RRK offered no evidence establishing that the trade secret component itself generated any customer demand or value for the non-trade secret components in the tool kits used in Mr. Gemini's calculations. Without this evidence it was legal error for RRK's expert to assume that Sears' alleged misappropriation **caused** RRK's lost profits on the non-trade secret components and the jury was provided no evidence to allow it to quantify the lost profit associated with just the trade secret component.

> a. Gemini's Home Depot lost profits calculation included profits associated with Roto Zip's Zip Mate attachment.

In calculating the Home Depot lost profits, Mr. Gemini assumed that Roto Zip would sell the same $151 tool kit to Home Depot that it sold to Lowes. That tool kit included the cutting tool, plunge base attachment and a right angle grinding attachment called a Zip Mate®. Yet, in calculating RRK's lost profits on sales to Home Depot, Mr. Gemini assumed that Roto Zip was entitled to recover profits for all of these items -- not just those linked to the plunge base attachment. But RRK presented no evidence that the plunge base attachment drove the sale of

the other, non-trade secret items in the kit. This was particularly inappropriate in view of evidence that Roto Zip sold a Spiral Saw® cutting tool with a plunge base accessory for $119 on QVC. At the very least, there is no basis for including any profits linked to the Zip Mate® attachment. Sears damages expert, Mr. Elson, testified that this error significantly inflated Mr. Gemini's Home Depot lost profits calculation.

>    b.    Gemini's Sears unjust enrichment calculation included profits associated with several non-trade secret components included in the All-In-One Cutting Tool kit.

Similarly, in calculating RRK's unjust enrichment damages, Mr. Gemini took Sears' entire profits on the sale of each All-In-One Cutting Tool kit. But, again, RRK offered no evidence justifying the assumption that RRK was entitled to all of Sears' profits from the sale of indisputably lawful components in Sears' Craftsman® All-In-One Cutting Tool kits, including the cutting tool, circle cutter attachment, handle attachment, straight edge attachment, fixed base attachment, collet wrench and bits. According to Sears' damages expert, this error alone may have inflated Mr. Gemini's unjust enrichment calculation by more than $8 million if one assumed that 50% of the profits of the All-In-One Cutting Tool kit were attributed to the alleged plunge base accessory.

>    **5.    RRK's Lost Profits Damages Were Cut Off In July 2002 When Dremel Entered The Market With An Acceptable Alternative Rotary Cutting Tool/Plunge Attachment Product.**

Ignoring the "head start" issue for the moment, to establish "but for" causation entitling it to lost profits, RRK was required to prove that there were not other acceptable, non-infringing substitute products available on the market during the period that it claims damages. *See Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1355-1356 (D. Fla. 2006) (granting defendant's JMOL and ordering new trial and finding the plaintiff did not produce sufficient evidence to establish that it would have earned a profit but for the defendant's

conduct and that there was no reasonable basis for the jury's compensatory damage award.); *see also Grain Processing Corp. v. American Maize-Products Co*., 185 F.3d 1341, 1353 (Fed. Cir. 1999) (stating that "the critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages.").[9]   In calculating RRK's lost profits, Mr. Gemini implicitly assumed that there were no acceptable, non-infringing substitute products available on the market during the period of August 2001 through July 2003. But RRK's own Vice President of Sales, Craig Rae, testified that at least as early as July 2002, Dremel was offering a rotary cutting tool with a plunge base accessory -- a plunge base accessory that he noted at the time looked just like Sears' accused accessory.  (Tr. 809, 828-830; C. Rae 07/31/02 email, D. Exh. 30)  In fact, Mr. Rae stated he believed that Home Depot was looking to carry the Dremel combination product.  (Tr. 807-809, 829-830)  Accordingly, and in addition to the "head start" limitation, RRK's lost profits damages period ended as a matter of law in July 2002.

### B. ALTERNATIVELY, SEARS IS ENTITLED TO A NEW TRIAL BECAUSE THE JURY'S DAMAGES AWARD WAS EXCESSIVE AND CLEARLY THE PRODUCT OF CONFUSION, PASSION AND PREJUDICE

RRK's proffer of grossly inflated damages numbers to the jury was extraordinarily prejudicial to Sears and resulted in a damages award that bears no rational relationship to the facts and runs counter to the law.  Roto Zip used its closing argument to impermissibly focus the jury's attention on the role of Choon Nang, a Chinese manufacturer, in replacing Roto Zip as

---

[9] To obtain lost profits as actual damages, "the patent owner must demonstrate that there is a reasonable probability that, but for the infringement, it would have made the infringer's sales." *State Industries, Inc. v. Mor-Flo Industries, Inc*., 883 F. 2d 1573, 1577 (Fed. Cir. 1989). "A standard way of proving lost profits, first announced in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F. 2d 1152, 1156 (6th Cir. 1978), is for the patent owner to prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Id*. "[A] patentee is not entitled to lost profits if the patentee fails to establish any of the above requirements." *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp*., 926 F. 2d 1161, 1165 (Fed. Cir.1991).  While addressing lost profits in patent cases, the reasoning is equally applicable to lost profits in a trade secret case.

Sears' supplier of the All-In-One Cutting Tool -- entirely lawful conduct[10] -- to generate a great deal of sympathy for the Kopras family and RRK and resentment against Sears and its foreign supplier. (Tr. 1389, 1391) RRK's counsel then invited the jury to punish Sears using Mr. Gemini's flawed analysis and grossly inflated damages numbers. Based on the verdict, the jury apparently bought into these arguments and adopted RRK's damages numbers. RRK failed, however, to meet the standard of proof for its choice of remedies and, thus, Sears is entitled to a new trial. *See Taliferro v. Augle*, 757 F.2d 157, 162 (7th Cir. 1985) (Plaintiff cannot be permitted to "throw himself on the generosity of the jury" for if "he wants damages he must prove them.").

The damages numbers suggested by RRK were not limited to a "head start" period and included profits for non-trade-secret components. In addition, the methodology used by RRK in calculating its actual loss was based on improper methodology and unreasonable assumptions, rendering the calculation speculative and unreasonable. The amount of the award is speculative and not supported by the evidence where it is not "tied to some evidence of value." *Zazu Designs v. L'Oreal,* 979 F.2d 499, 505-06 (7th Cir. 1992) (stating "people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. Compensatory damages must rest on a just and reasonable estimate of the damage based on relevant data").

**1.    The Jury's Unjust Enrichment Award Improperly Includes Non-Trade-Secret Components Of Its All-In-One Cutting Tool Kit And Was Not Limited To The "Head Start" Period.**

The ITSA limits RRK's damages to those "caused by the misappropriation." See 765 ILCS 1065/4. As a result, RRK was obligated to prove that Sears' profits are the result of its

---

[10] In fact, even Mr. Kopras conceded that Sears, like others tool manufacturers with competing tools on the market, was free to "knock off" its Spiral Saw® rotary cutting tool and sell a competing product at least as early as March 1999. (Tr. Tr. 123-125, 130-131)

alleged misappropriation, and not otherwise attributable to non-trade-secret components or competitive pricing. *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992) (finding that damages expert "should have tried to separate the damages that resulted from the lawful entry of a powerful competitor . . . from the damages that resulted from particular forms of misconduct allegedly committed by that competitor"). RRK did not, however, offer evidence that even a single consumer purchased Sears' All-In-One Cutting Tool because of the accused plunge base accessory, let alone that the inclusion of the plunge base attachment drove the sales of the non-trade-secret components included in the Craftsman® All-In-One Cutting Tool Kit. The only evidence offered at trial indicated that Sears' low price, and not any of the individual accessories, drove Sears' sales. Further, Mr. Kopras' admitted that Sears was free to sell the entire kit with all its components, including the rotary cutting tool itself, except the plunge base attachment without violating his asserted trade secret rights. (See Tr. Tr. 123-125, 130-131). Thus, RRK was required to, but did not, apportion its unjust enrichment damages to profits associated with just the trade secret component but, instead, included all of Sears' profits, including those linked to the lawful sale of non trade secret components. RRK failed, however, to meet its burden of proving that it was entitled to any, let alone all, of Sears' profits.

In addition, RRK grossly overstated its unjust enrichment damages by including all of Sears' profits on the sales of its All-In-One Cutting Tool kit during the period of August 2001 through the end of February 2005. Throwing out this grossly-inflated number allowed RRK to condition the jury to the suggestion of awarding damages of almost $17 million despite Sears' repeated objections.[11] Apparently realizing the legal defects in the period used for its damages

---

[11] Of course, RRK bolstered its legally erroneous argument with other fallacies designed to obtain a sympathetic verdict, such as pointing out that it was only seeking a "portion" of Sears' profits, and making repeated references to "foreign" persons who "don't care" about intellectual property rights. (Tr. 1367-1368, 1389.) Those arguments were clearly intended to inflame the jury, and were apparently successful.

calculations, RRK's counsel argued, for the first time during closing arguments and without any evidentiary support, that it take Sears at least 36 months to reverse engineer a plunge base accessory, based on the time that it took Choon Nang to manufacture an entire rotary cutting tool, a circle cutting guide, a flex shaft, a "fixed" base, and an accessory handle, and then bring all of these items up to Craftsman® standards. (Tr. 1390-1391.) He then suggested another seven-month "kicker," a number literally conjured out of thin air, to get to 36 months. (Id.) RRK's intent was transparent -- it wanted to encourage the jury to determine damages based on Sears' profits over a period for longer than any reasonable "head start" period. But even with its unsupported, artificially-contrived "head start" argument, RRK did not and could not provide the jury with amount of Sears' profits during this 36-month period because RRK's damages expert never made such a calculation -- leaving the jury to make that "calculation" on its own.

The "head start" period cannot, as a matter of law, include the period of time associated with developing the rotary cutting tool portion of RRK's alleged trade secret because numerous competitive rotary cutting tools were marketed by several power tool companies, including DeWalt, Makita, Ryobi, Black & Decker and Dremel, and, thus, the tool was not subject to any trade secret protection. Nor can the "head start" period include the time it takes to develop a circle cutter, accessory handle, fixed base, case, flex shaft or bits -- none of those items were subject to any trade secret protection. And the "head start" period cannot be based upon the time it took Choon Nang to bring its tool up to the Craftsman brand standards -- RRK's own tool never met those standards, and in any event that time was again dedicated to bringing the motor unit itself up to specs, and not the plunge base accessory.

Nevertheless, the jury apparently adopted RRK's suggestion that there should not be a "head start" or that it should be lengthened beyond any period supported by the evidence,

CHI 56872028v3 12/5/2007

resulting in a legally erroneous and excessive award. This Court can strike sums which are clearly unsupported as a matter of law without even offering RRK the option of a new trial. *See Haluschak v. Dodge City of Wauwatosa, Inc.*, 909 F.2d 254, 257 (7th Cir. 1990).

> **2.** **Sears Is Entitled To A New Trial Because The Jury Should Have Been Instructed To Apply A "Head Start" Limitation Period And To Apportion Profits To Just Those Associated With The Trade Secret Misappropriation.**

Sears is entitled to a new trial because it was sufficiently prejudiced by the Court's refusal to fully instruct the jury on damages and because the jury did not obey the instructions that were provided. "Failure by the jury to follow the court's instructions, which results in prejudice to the moving party, is a proper ground for a new trial." *Shushereba v. R.B. Industries, Inc.*, 104 F.R.D. 524, 529 (W.D. Pa. 1985); *citing Thomas v. Stalter*, 20 F.3d 298, 303 (7th Cir. 1994); *see also Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1356 (D. Fla. 2006). (granting new trial where defendant demonstrated that the jury disregarded the Court's instructions). Where a jury instruction is at issue, a party is entitled to a new trial if the Court finds that "(1) the instruction inadequately states Seventh Circuit law; and (2) the error likely confused or misled the jury causing prejudice to the movant." *Gile v. United Airlines, Inc.*, 213 F.3d 365, 375 (7th Cir. 2000). When reviewing a challenge to a jury instruction, a court "must view the instruction as a whole and consider the challenged instruction 'both in the context of the other instructions given and in light of the allegations of the complaint, opening and closing arguments and the evidence of record." *Sims v. Mulcahy*, 902 F.2d 524, 533 (7th Cir. 1990).

Here, the Court declined to provide the jury with instructions offered by Sears explicitly requiring the application of a "head start" limitation or addressing the requirement to apportion the damages to just those linked to the trade secret misappropriation. Instead, the Court opted for

a less detailed jury instruction that, while tracking the statutory language, failed to explain to the jury that it was necessary to apply the "head start" and "apportionment" concepts to determine damages in view of the undisputed facts. (Tr. 1320-1321; Sears' Objections to Jury Instructions, Docket No. 279.)   The general damages instruction provided, coupled with RRK's failure to present any alternative data for apportioning lost profits to just those linked to Sears' alleged unlawful conduct and failure to limit its damages theories to the "head start" period, left the jury with the perception that it was obligated to calculate damages using the grossly inflated, damages numbers offered by Mr. Gemini.[12]

### 3. Sears Is Entitled to A New Trial Or An Order of Remittitur Because The Damages Award Is Excessive, Against The Clear Weight Of The Evidence And Depends On Improper Evidence.

Finally, Sears is entitled to a new trial because the jury's award of lost profits is excessive, against the clear weight of the evidence, and the result of unfair trial and discovery tactics by RRK.  Specifically, in addition to the "head start" and apportionment defects addressed *supra*, the jury's lost profits award also is the product of a series of evidentiary rulings and questionable trial tactics that resulted in a grossly unfair trial on the issue of lost profits.

First, the jury clearly erred in awarding $11,664,105 in lost profits when Gemini only testified to $11,229,798 at trial.   The jury apparently obtained the $11,664,105 number from an error in  Schedule 6 of Gemini's expert report (See D. Ex. 194).

Similarly, the jury erred in awarding RRK an additional $1,688,136 in unjust enrichment damages because that amount was wholly speculative.  There was no evidence presented that would have allowed the jury to come up with this number.  Moreover, the unjust enrichment

---

[12] Moreover, despite hearing evidence of an appropriate royalty amount from Sears' expert during the trial, the jury was not instructed about a "reasonable royalty" measure as an alternative damages measure and did not know the Court was reserving the determination of a "reasonable royalty" measure for itself in the event that damages were found to be uncertain and speculative.

damages award was obviously derived from alleged injury after the date that RRK sold substantially all of its rights to Bosch in August 2003 because the jury adopted the full measure of lost profits damages up through this date. In addition, the unjust enrichment award is improper because it is based on alleged injury to RRK after it had sold all rights in the trade secret combination tool to Bosch and, thus, Sears' alleged unlawful misappropriation could not possibly have caused Sears to be enriched at RRK's expense. If causation ceased, as Mr. Gemini admitted, after the sale of the business assets for purposes of calculating lost profits, then it also ceased as a matter of law for calculating unjust enrichment damages.

Finally, RRK's Home Depot lost profits hinged entirely on the testimony of Mike Farrah, the son of Home Depot's founder and a then tool buyer for Home Depot. (Tr. 537-538). During his deposition, which RRK noticed and arranged, RRK's counsel repeatedly obstructed and frustrated Sears' counsel's attempts to confront Mr. Farrah with statements contradicting his testimony.[13] The need to confront Mr. Farrah with this evidence cannot be overstated as it flatly contradicted his deposition testimony with statements recorded by RRK Vice President of Sales Craig Rae in emails and internal RRK memos summarizing Roto Zip's contemporaneous meetings with Mr. Farrah, which Mr. Rae later confirmed at trial. Sears moved to exclude Mr. Farrah's deposition testimony at trial on the grounds that Sears was not afforded a fair opportunity to cross-examine Mr. Farrah. (Id.) The Court denied that motion and RRK was allowed to read in Mr. Farrah's testimony during the case. The jury was, of course, completely unaware that RRK's counsel obstructed Mr. Farrah's cross examination as those inappropriate comments were not read to the jury. As a result, it sounded to the jury as if Mr. Farrah's answers went uncontested. The jury apparently disregarded the testimony of Roto Zip's Vice President

---

[13] The grounds for striking Mr. Farrah's deposition testimony were set forth in Sears' Motion in Limine No. 1 - To Exclude the Deposition Testimony of Michael Farrah. (Dkt. No. 105 and 107) RRK's counsel at one point yelled at Sears' junior-associate counsel during this part of Farrah's deposition stating that he was "sick of her." (See Id.)

of Sales, Mr. Rae, who appeared as a live witness and who confirmed that he had repeatedly offered RRK's plunge base accessory to Home Depot as part of a kit long before and long after Sears was on the market with its All-In-One Cutting Tool, and that Home Depot repeatedly declined his offers because RRK could not provide the accessory at an acceptable price.[14] While the jury was never aware of the circumstances of Mr. Farrah's deposition testimony, the Court surely is and Mr. Rae soundly repudiated any suggestion that Home Depot would have purchased RRK's plunge base accessory but for Sears' sale of the All-In-One Cutting Tool kit.

The verdict simply does not meet the test for rationality in light of all of the evidence presented and it would be a miscarriage of justice to allow the jury's verdict on damages to stand despite the likelihood that it is based on confusion, passion and prejudice induced by RRK's improper closing argument and inflated damages numbers. Accordingly, Sears is entitled to a new trial because the jury verdict was against the great weight of the evidence or, alternatively the Court should enter an order conditioning a new trial on RRK's acceptance of a *remittitur*. On *remittitur*, the Court should limit damages to those apportionable to the alleged trade secret misappropriation and limit the damages period to a head start period of between 5½ to 8 months. Ms. Lawton's reasonable royalty analysis provided the only damages evidence that satisfies these legal requirements.

## IV. CONCLUSION

For all of the foregoing reasons, this Court should enter judgment as a matter of law pursuant to Rule 50(b) that RRK is not entitled to damages under either its lost profits or unjust enrichment theories or alter the judgment pursuant to Rule 59(e) because the jury committed

---

[14] Mr. Rae also confirmed that Home Depot tool buyers, including Mr. Farrah, had never once identified the Sears All-In-One Cutting Tool as a reason for not purchasing the plunge base accessory kit -- in direct contradiction to Mr. Farrah's deposition testimony, and a matter on which Sears was not permitted a fair opportunity to cross-examine. (Tr. 816)

manifest error in finding damages under these damages theories. Alternatively, this Court should

grant a new trial or enter an order of *remittitur* because the jury's verdict goes against the weight

of the evidence and demonstrates that it was the product of confusion, passion and prejudice.

Dated: December 5, 2007

Respectfully Submitted,

SEARS, ROEBUCK AND CO.

By:  /s/ Jeffrey G. Mote
     Richard D. Harris (IL Bar No. 1137913)
     Mark R. Galis (IL Bar No. 6206938)
     Jeffrey G. Mote (IL Bar No. 6243534)
     Cameron M. Nelson (IL Bar No. 6275585)
     GREENBERG TRAURIG LLP
     77 West Wacker Drive
     Suite 2500
     Chicago, Illinois  60601
     (312) 456-8400

*CHI 56872028v3 12/5/2007*

## CERTIFICATE OF SERVICE

I, Cameron M. Nelson, certify that on December 5, 2007, I caused a true copy of

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR,**

**IN THE ALTERNATIVE, FOR A NEW TRIAL OR *REMITTITUR,* ON DAMAGES** to be

served with the Clerk of the Court using the CM/ECF system which will send notification and

copies of this filing upon the following:


Mark M. Grossman, Esq.
Lee F. Grossman, Esq.
Grossman Law Offices
29 South LaSalle Street
Suite 1210
Chicago, Illinois 60603


/s/ Cameron M. Nelson
Cameron M. Nelson

CHI 56872028v3 12/5/2007